MICHAEL H. MEISELMAN v. IRA S. MEISELMAN, LAWRENCE A. POSTON, PAUL EDWARD LLOYD, EASTERN FEDERAL CORPORATION, RADIO CITY BUILDING, INC., CENTER THEATRE BUILDING, INC., COLONY SHOPPING CENTER, INC., GENERAL SHOPPING CENTERS, INC., M & S SHOPPING CENTERS OF FLORIDA, INC., MARTHA WASHINGTON HOMES, INC., AND TRY-WILK REALTY COMPANY, INC.

No. 8126SC692

(Filed 21 September 1982)

1. **Corporations § 13 — closely held corporation — insufficient evidence to support court's findings concerning corporate policy — alternatives to dissolution should have been considered — summary judgment improper**

   In an action by a minority stockholder against the different corporations and the majority stockholder, his brother, the trial court erred in entering summary judgment for defendant since the evidence did not support the trial court's findings that (1) there was an absence of evidence that "corporate financial policy . . . resulted in any inequities to" plaintiff; (2) that there was "a lack of evidence to support the finding of fact that personal differences between the majority and minority stockholders have in any way influenced corporate policy;" or (3) that "there (was) no evidence to support the finding of fact that there was . . . the taking of unfair advantage of the minority stockholder." Considering the range of options available to our courts under G.S. 55-125.1, the trial court misapplied the applicable law *and* abused its discretion by concluding that relief, other than dissolution, under G.S. 55-125.1 was not reasonably necessary for plaintiff's protection. G.S. 55-125(a)(4).

2. **Corporations § 12 — inability of majority stockholder in one corporation to divert profits from that corporation into another corporation solely owned by the majority stockholder**

   In an action by a minority stockholder against a majority stockholder, the trial court erred in finding as a matter of law "no actionable breach of

fiduciary responsibility," where the majority stockholder, in the corporation in which plaintiff also shared stock, was permitted to retain profits diverted into the majority stockholder's solely owned corporation. G.S. 55-35.

Judge HILL dissenting.

APPEAL by plaintiff from *Lewis, Judge*. Judgment entered 29 January 1981 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 5 March 1982.

Plaintiff, Michael Meiselman, and defendant, Ira Meiselman, are brothers who received stock in the defendant corporations by gift and bequest from their parents. Defendant corporations own and manage movie theaters and other real estate in North Carolina, Georgia and Florida. Ira owns or controls approximately sixty to seventy percent of the business; Michael owns approximately thirty to forty percent of the business.

Michael, as the minority shareholder, brought suit, asserting for purposes of this appeal, two claims. First, Michael argues that an involuntary dissolution or, alternatively, a buy-out of Michael's share of the business is necessary because of an irreconcilable conflict between him and his brother. Second, Michael seeks, derivatively, on behalf of the family corporations, to recover profits diverted into a corporation owned solely by Ira.

The trial court, sitting without a jury, entered judgment dismissing both claims, and the plaintiff appealed.

*Fleming, Robinson, Bradshaw & Hinson, P.A., by Russell M. Robinson, II, for plaintiff appellant.*

*Blakeney, Alexander & Machen, by J. W. Alexander, Jr., for individual defendant appellees.*

*Farris, Mallard & Underwood, P.A., by Ray S. Farris, for corporate defendant appellees.*

BECTON, Judge.

With remarkable clarity, and in exceptionally well-researched and well-written briefs, the parties have painstakingly set forth their contentions.[1] Indeed, we have partially adopted, as a model,

---

1. Although the briefs are a model of clarity, they win no laurels for brevity. Plaintiff's 62-page brief contains 62 footnotes, cites reported cases from Canada,

the outlines used by the parties in structuring their arguments. Having reviewed the record and the applicable law, we reverse the trial court's holdings that Michael is not entitled to relief under G.S. 55-125.1 and that there was no actionable breach of fiduciary duty by Ira.

I

The Development and Distribution of the H. B. Meiselman Enterprise.

Michael and Ira are the only surviving children of H. B. Meiselman, who emigrated to this country in 1913. By 1951, Mr. Meiselman had accumulated substantial wealth in movie theaters and real estate, and, in that year, he formed several interrelated corporations into which he transferred most of his property. In 1951, Mr. Meiselman also initiated a series of *inter vivos* gifts of corporate stock to Michael and Ira, a course of action which eventually led to ownership by his sons of virtually all of his holdings. For the most part, Michael and Ira were treated equally in the gifts and bequests from their parents.[2] In September 1968, however, defendant Eastern Federal Corporation (Eastern) was formed by Mr. Meiselman and several existing corporations were merged into it, making Eastern, in effect, the parent corporation. Mr. Meiselman vested control of Eastern in Ira in 1968, and Ira has been the controlling shareholder since that time.

On 13 March 1971, Mr. Meiselman made his final *inter vivos* gift of stock to his sons when he transferred 83,072 shares of stock in Eastern to Ira, and 1,966 shares of stock in that company to Michael. As stated by Michael in his brief, the result of these transactions is a complicated pattern of ownership with the defendant corporations owning stock in each other. The percentage of ownership, including intercorporate ownership, is as follows:

England, Scotland and South Africa, unreported cases from North Carolina and California, and refers to Business Week, Time Magazine, The New York Times, and the Holy Bible. Seeking not to be outdone, defendants' 37-page brief contains 43 footnotes and cites cases from foreign jurisdictions.

2. The brothers also received stock by inheritance from their mother, who died in 1966.

| Ira and family | — | 39.07% |
| Michael | — | 29.82% |
| Defendant corporations | — | 31.11%[3] |

Under Mr. Meiselman's leadership the corporations never paid dividends. They were operated, insofar as possible, on a cash basis with a minimum of borrowed funds. Mr. Meiselman followed a policy of "plowing back" earnings for expansion of his enterprise. By 1968, when Ira took control of operations, the *book value* of all the defendant corporations was $3,412,403. After ten years under Ira's management, this value has increased to $11,168,778.[4]

The *tax value* of Eastern's fixed assets is approximately 135% of the *book value*. Michael argues that if the total *book value* of all corporations (not just Eastern) were increased by 135%, the assessed tax value of the enterprise as of 31 December 1978 would have been over fifteen million and that the *fair market value* of the enterprise would have been even greater.

II

(1) Relief under G.S. 55-125.1 as an alternative to involuntary dissolution under G.S. 55-125(a)(4).[5]

Reduced to its basics, Michael's claim is that he inherited millions which he cannot get or control. Specifically, Michael argues that an order requiring the defendants to "buy him out at the appraised fair value of his interest" is necessary for his protection because (i) an irreconcilable conflict, causing intense

3. Michael contends that Ira does not own all the stock that the corporations own themselves and that his percentage of ownership in the business can be properly calculated "only by eliminating the intercorporate ownership in accordance with generally accepted accounting principles, and that such calculations would show that he owns approximately 43% of the business."

4. Michael's share of that book value would be $3,330,303 using the 29.82% figure, and approximately $4,800,000 using the 43% figure.

5. Although praying for an involuntary dissolution, or, alternatively, a buy-out in his Complaint, plaintiff, at trial, sought only a buy-out. In its 29 January 1981 judgment the trial court specifically said: "The plaintiff does not seek dissolution of the corporations as provided in G.S. 55-125, but does request the court to exercise its discretion to eliminate the minority interest of the plaintiff in these corporations in accordance with G.S. 55-125.1. . . ."

hostility and bitterness, exists between Michael and Ira; (ii) Ira has control of the family corporations and has totally excluded Michael from any participation in the business, and has, moreover, fired him; and (iii) Michael is unable to use or control his inheritance, which ranges from three to seven million dollars, because of Ira's actions.

G.S. 55-125(a)(4) authorizes the involuntary dissolution of a corporation when "reasonably necessary for the protection of the rights or interests of the complaining shareholder." Involuntary dissolution, however, is not the exclusive remedy in North Carolina, because under G.S. 55-125.1 the court has broad discretion to grant any kind of relief it deems appropriate as an alternative to dissolving a corporation.

The breadth of the relevant provisions of our Business Corporation Act, G.S. 55-125, *et seq.*, can best be understood by an historical analysis which demonstrates that our courts should not hesitate to dissolve corporations or grant other relief to minority shareholders when relief is warranted. Realizing then that the statutory provisions authorize relief for minority shareholders, our trial courts must, in the exercise of sound discretion, determine the relief, if any, a minority shareholder is entitled to receive. While it is true that history teaches that we are not to be blinded by narrow common law precepts and that our legislature did not view corporate existence as a "sacred cow," Latty, "The Close Corporation and the New North Carolina Business Corporation Act," 34 N.C.L. Rev. 432, 448 (1956), it is equally true that our legislature did not intend for the cow to be butchered. *See* Comment: Deadlock and Dissolution in the Close Corporation: Has the Sacred Cow Been Butchered? 58 Neb. L. Rev. 791 (1979).

(a) Historical Background

Although the courts at common law did not have the power to dissolve corporations in suits by shareholders, that rule was modified for the protection of shareholders in a few cases. *See,* for example, *Miner v. Belle Isle Ice Co.,* 93 Mich. 97, 53 N.W. 218 (1892). The dissolution of corporations was most often seen in cases involving closely held corporations in which "there [were] only a few stockholders, so that the corporation for practical purposes, as between those interested, [was] much like a partnership." *Flemming v. Heffner and Flemming,* 263 Mich. 561,

568, 248 N.W. 900, 902 (1933). *See also State ex rel. Conlan v. Oudin Etc. Mfg. Co.*, 48 Wash. 196, 198, 93 P. 219, 220 (1908) and Israels, *The Sacred Cow of Corporate Existence: Problems of Deadlock and Dissolution*, 19 U. Chi. L. Rev. 778 (1952). Interestingly, not all courts accepted the close corporation-partnership analogy. In *Baker v. Commercial Body Builders*, 264 Or. 614, 630, 507 P. 2d 387, 394 (1973), the Oregon Supreme Court aptly stated the contra view:

> We also reject the concept that a "closed corporation" is like a partnership to the extent that a minority stockholder should have the same right as a partner to demand a dissolution of a business upon substantially the same showing as may be sufficient for the dissolution of a partnership. After all, the remedy of a forced dissolution of a corporation may equally be "oppressive" to the majority stockholders.

This contra view expressed in *Baker* did not reverse the trend. Courts, generally speaking, have not viewed corporate entities as "untouchables" or "sacred cows." State legislatures have followed suit, giving more protection to minority shareholders. Now every state has a statute authorizing its courts to order the involuntary dissolution of a corporation upon the petition of the complaining shareholder when the shareholders are deadlocked, when the majority shareholders are oppressing the minority shareholders, or when liquidation is deemed necessary for the protection of the rights and interests of the minority shareholders.[6]

In the absence of a deadlock, involuntary dissolution is most often authorized by statutes or ordered by courts when there is a showing of mismanagement or wrongdoing[7] or when "fairness" requires court relief.[8] Moreover, "oppressiveness," as a statutory ground for dissolution, does not mean "illegal" or "fraudulent" conduct. Courts have uniformly equated oppressive conduct with impropriety and wrongful conduct by majority shareholders. For

---

6. *See* statutes cited in Model Business Corporation Act, Annot., § 97, ¶ 6 (1971, 1973 supp.; 1977 supp.).

7. *See* 19 Am. Jur. 2d, Corporations, §§ 1604, 1605 (1965).

8. *See Stumpf v. C. E. Stumpf & Sons, Inc.*, 47 Cal. App. 3d 230, 120 Cal. Rptr. 671 (1975).

example, *see* Annot. 56 A.L.R. 3d 358, 362 (1974) in which it is said:

> "[O]ppression" . . . [is] defined as a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely, and also as a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members. It has been observed that as interpreted by some decisions, this ground has some latitude beyond the common law situations and may include acts which thwart the expectations of a shareholder that the corporation will be run honestly and ratably for the benefit of all shareholders, and that the shareholder will be allowed to participate in management.

*See also*, Comment, Oppression as a Statutory Ground for Corporate Dissolution, 1965 Duke Law Journal 128.

    (b) The North Carolina Business Corporations Act and Its Legislative History.

    G.S. 55-125.1 was copied from a virtually identical provision in the South Carolina Business Corporation Act.[9] With regard to the South Carolina Act, Professor Ernest L. Folk, III, the drafter and official reporter of that Act, stated: "The trend is towards increasingly liberal grounds for dissolution by court order, remembering always that the court does not dissolve corporations automatically, but only if, broadly speaking, it believes dissolution to be equitable." S. C. Business Corporation Act, Annot. Ed. p. 181 (1964). Folk suggested that in addition to involuntary dissolution provisions, the legislature should offer the courts an alternative. Consequently, the S. C. Business Corporation Act expressly provided that relief could be granted thereunder even if involuntary dissolution would not be appropriate. Folk recommended that the same provision be added to the North Carolina Business Corporation Act. Folk, "Revisiting the North Carolina Corporation Law: The Robinson Treatise Reviewed and the Statute Reconsidered," 43 N.C. L. Rev. 768, 870-71 (1965). Following the suggestions in Folk's article, our Business Corporation

---

    9. *See*, S. C. Code Ann. § 12-22.23 (1962), subsequently recodified as S. C. Code Ann. § 33-21-230 (1976).

Act was revised, and G.S. 55-125.1 containing the language of the S. C. Business Corporation Act was enacted in 1973. 1973 N.C. Sess. Laws 469, s. 1.

G.S. 55-125.1 reads:

Discretion of court to grant relief other than dissolution. —(a) In any action filed by a shareholder to dissolve the corporation under G.S. 55-125(a), the court may make such order or grant such relief, other than dissolution, as in its discretion it deems appropriate, including, without limitation, an order:

(1) Canceling or altering any provision contained in the charter or the bylaws of the corporation; or

(2) Canceling, altering, or enjoining any resolution or other act of the corporation; or

(3) Directing or prohibiting any act of the corporation or of shareholders, directors, officers or other persons party to the action; or

(4) Providing for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders, such fair value to be determined in accordance with such procedures as the court may provide.

(b) Such relief may be granted as an alternative to a decree of dissolution, or may be granted whenever the circumstances of the case are such that relief, but not dissolution, would be appropriate.

(c) Statutory Interpretation and Analysis

The words of the statute are simple and clear. The confluence of G.S. 55-125.1 and G.S. 55-125(a)(4) gives the trial court plenary power to frame whatever order it sees fit to protect the rights of a complaining shareholder. This seems especially significant since the North Carolina Business Corporation Act was acclaimed, when enacted, as the most progressive and significant legislative contribution yet made to the law of close corporations. O'Neal, *Close Corporations*, § 1.14(a), n. 4 and supporting texts (2d ed. 1971). Indeed, Michael's counsel, long before this litigation en-

sued, wrote: "This is the most sweeping authority granted by any state statute, other than the South Carolina statute from which it was taken almost verbatim." Robinson, *North Carolina Corporation Law and Practice*, § 29-14 at 596 (2d ed. 1974).

Considering the history and liberal sweep of our Business Corporation Act, we interpret G.S. 55-125(a)(4), which authorizes liquidation, not when there is "oppression," but when it is reasonably necessary for the protection of the complaining shareholder, to require the complaining shareholder only to show that basic "fairness" compels dissolution. *A fortiori*, G.S. 55-125.1(b), which authorizes a court to grant, without limitation, such other relief as it deems appropriate "as an alternative to a decree of dissolution or . . . whenever the circumstances of the case are such that relief, but not dissolution, would be appropriate," does not require a complaining shareholder to show bad faith, mismanagement or wrongful conduct, but only real harm.

Remembering, then, that: (1) "oppression" is not listed as a statutory ground for involuntary dissolution under G.S. 55-125(a); (2) that Michael does not seek the harsher remedy of dissolution; and (3) that our trial courts need find only that an alternative to dissolution is appropriate—that is, reasonably necessary for the protection of the complaining shareholder—, we review the trial court's exercise of discretion.

(d) The Exercise of the Court's Discretion

[1] Michael first contends that the refusal to grant any relief at all was a clear abuse of discretion and "an unprecedentedly restrictive decision made under what is and was intended to be the most liberal and enabling statute in any state." Given the applicable law, it was the trial court's duty to review all the evidence to determine whether fairness and the equities warranted judicial intervention. We conclude that the trial court's findings of fact, relevant portions of which follow, are not supported by the evidence:

II. As to the exercise of the Court's discretion in accordance with G.S. § 55-125.1, the Court finds:

A. The corporate philosophy of all the defendants has remained the same under Ira S. Meiselman as it was under

H. B. Meiselman, to wit, a "pay as you go" or conservative approach to business management.

B. The record is silent, and there is an absence of evidence . . . that corporate financial policy has resulted in any inequities to minority stockholder Michael H. Meiselman.

C. There is no evidence of unexplained:

1. Increases of salaries of corporate officers including Ira S. Meiselman;

2. Increase [sic] in corporate reserves such as depreciation, capital improvement or any other reserve;

3. Changes in dividend policy to the detriment of the minority stockholder;

4. Retention of earnings (an area closely monitored by IRS) to the detriment of the minority stockholder, Michael H. Meiselman;

5. Purchases of assets to obtain long term appreciation of asset values for the benefit of second-generation heirs.

D. There is no evidence of bad faith or the adoption of unduly expansive growth requiring capital outlays to the detriment of the majority or minority stockholders.

. . . .

F. The management of these companies has resulted in a ten-year growth from 1968 to 1978 in book value of the minority shareholder's equity of $2,500,000.00; such book value increased further in 1979.

G. There is a lack of evidence to support a finding of fact that personal differences between the majority and minority stockholders have in any way influenced corporate policy, financial or otherwise; and to the contrary the record indicates that objections by minority stockholder, Michael H. Meiselman, apparently motivated the corporations and the individual defendants to:

1. Abandon a merger; and

2. Terminate a management agreement between Republic Management Corporation and Eastern Federal Corporation.

H. There is no evidence to support a finding of fact that there was oppression, overreaching on the part of management, the taking of any unfair advantage of the minority stockholder by the majority stockholder or any other wrongful conduct on the part of the majority stockholder, Ira S. Meiselman.

I. In the absence of gross abuse or the taking of gross unfair advantage by the majority·stockholder, the Court's exercise of discretion to require a sale would be, as a practical matter, difficult to effectuate.

1. Book value is not the same as market value.

2. The shares of a closely held corporation are not marketable generally.

3. If the businesses are to continue, ordinarily a majority stockholder would prefer to pay a premium to avoid an uncooperative holder of the outstanding shares.

J. There is no deadlock in the management of the corporate affairs of any defendant corporation.

K. There is no evidence of the financial ability of or the appropriateness of any other individual stockholder purchasing the shares of Michael Meiselman.

We have found only a few cases in which our appellate courts have been asked to review the trial court's exercise of its discretion in cases brought under G.S. 55-125(a)(4) and 55-125.1. *See Dowd v. Foundry Co.*, 263 N.C. 101, 139 S.E. 2d 10 (1964); *Royal v. Lumber Co.*, 248 N.C. 735, 105 S.E. 2d 65 (1958); and *Graphics, Inc. v. Hamby*, 48 N.C. App. 82, 268 S.E. 2d 567 (1980). This may mean, as a practical matter, that shareholders do not usually appeal discretionary denials or grants of relief by trial courts because of the broad discretionary powers vested in trial courts. After all,

[t]he rule is universal that the action of the trial court as to matters within its judicial discretion will not be disturbed unless there is a clear abuse thereof; or, as it is frequently

stated, the appellate court will not review the discretion of
the trial court.

*Welch v. Kearns*, 261 N.C. 171, 172, 134 S.E. 2d 155, 156 (1964)
*quoting* 3 Am. Jur., Appeal & Error, § 959.

The "universal" rule should not, however, be applied in this
case. The record shows great bitterness and hostility between Ira
and Michael. In his deposition testimony, Ira said: "Yes, it is my
position . . . that . . . Michael suffers . . . from crippling mental
disorders and that was a reason that my father put me in control
of the family corporations." Further, Ira, who effectively exer-
cises total control of the defendant corporations, has completely
denied Michael any participation in the management of the de-
fendant corporations,[10] including establishing dividend policy and
declaring dividends,[11] has fired Michael from employment, thus
depriving Michael not only of his salary but also from all other
employment benefits, and has, occasionally, denied Michael access
to the corporate offices, premises, books of accounts, and records.
In other words, the evidence shows that Michael's immense book
value wealth is being rendered worthless to him as current in-
come, and that, despite Michael's stock in the corporate enter-
prises, he is denied the benefits of that ownership.

We are persuaded that this evidence cannot by any stretch of
judicial discretion support the trial court's finding that there is an
absence of evidence that "corporate financial policy has resulted
in any inequities to minority stockholder Michael Meiselman;" or
that "there is a lack of evidence to support the finding of fact
that personal differences between the majority and minority
stockholders have in any way influenced corporate policy;" or
that "there is no evidence to support the finding of fact that

---

10. Michael's right, by cumulative voting to elect himself to the Board of Direc-
tors of the defendant corporations, seems a futile gesture in view of the following
statement made by Ira's attorney and contained in Defendants' Exhibit 9:

> We have no desire to see the productive efforts of the boards be affected by
> possibly allowing them to function as a forum for airing personal hurts and
> slights; and we all recognize that the course of business activity for the com-
> panies is not going to be altered by Michael's representation.

11. It is true that Michael has received dividend income since 1977 including
approximately $60,000 in dividends in 1980. Michael's annual return, however, using
either the 29 or 43 percent ownership figure, is less than 2 percent.

there was . . . the taking of unfair advantage of the minority stockholder."

Further, the trial court's finding "I" (ante, p. 12) is more properly classified as a conclusion of law, and is neither supported by the evidence nor by any other finding of fact. The reasoning expressed in this "finding" indicates that the trial court reached its judgment on a misconception of applicable law. The sale of stock in large closely held corporations may be unlikely; it may, as a practical matter, be difficult to effectuate; but this is certainly no ground for denying Michael relief under the applicable provisions of the Business Corporation Act.

Michael also argues that "since the trial court did not understand that under the statute it could order a determination of 'fair value' that would bind both sides," and since the trial court erroneously believed that there had to be evidence of "bad faith" or "oppression" or "gross abuse" or "deadlock" to justify ordering the purchase of Michael's shares, the trial court's purported exercise of discretion in denying relief to Michael was defective.

Michael takes solace in the colloquy between the trial judge and Michael's attorney during closing argument concerning the binding effect of an audit and in the following paragraph that was included as part of the Initial Memorandum of Judgment:

> 4. Even if the Court should order an expensive full audit as a requisite to exercising its discretion, this Court has no assurance that either shareholder would accept the results of such an independent audit; and even if, as counsel for plaintiff admitted, the plaintiff would agree to be bound by that audit, the defendant has made no such concession, and without both agreements to be bound the Court's exercise of discretion would in effect foster another lawsuit.

Record on Appeal, at 195. Significantly, the Initial Judgment was never signed, and the portion excerpted above from Paragraph 4 was not included in the final judgment. Moreover, that the Initial Memorandum of Judgment was not to be binding is evidenced by the prefacing remarks of the trial court:

> COURT: Mrs. Parker, I'll ask you to take this down in the form of a memorandum of judgment which the Court would edit grammatically *as well as otherwise*, but the essential

findings—I will attempt to articulate the essential findings that the judgment shall contain, *together with any you gentlemen care to offer.* [Emphasis added.]

Record on Appeal, at 192.

We are compelled to note, as did defendants, that if tentative thoughts take precedence over formal orders, appellate courts will be clogged as a practical matter. As a legal matter, Michael makes no assignment of error with regard to the colloquy or the Initial Memorandum of Judgment. He therefore cannot use the colloquy as a separate basis to argue prejudicial error. The colloquy does suggest the trial judge's thought processes, however, and we are convinced that the trial court misconceived and misapplied the law.

We reach our conclusion that fairness and the equities warrant judicial intervention in this case in the face of defendants' strenuous argument that courts still show an aversion to ordering the dissolution of solvent and profitable corporations. Michael himself admits that the corporate defendants are strong financially, and that under the leadership of Ira, Ira's and Michael's net worth have increased enormously—more than three hundred percent. On this point, defendants rely primarily on a passage from Carlos Israel's article, *The Sacred Cow of Corporate Existence: Problems of Deadlock and Dissolution,* 19 U. Chi. L. Rev. 778, 785 (1952),[12] but Israel dealt with "deadlock and dissolution," neither of which is present in this case.

We fully recognize a potential misuse of involuntary dissolution statutes by dissatisfied minority shareholders who desire to place undue pressure on majority shareholders; we recognize also that "[t]he ends of justice would not be served by too broad an application of [an involuntary dissolution] statute, for that would merely eliminate one evil by substituting a greater one—the op-

12. Israel states:

It has been suggested that the courts' reluctance to dissolve varies in inverse ratio to the prosperity of the enterprise; that where the faction which happens to be in office at the date of the resignation, death or other incident which caused the *deadlock* is continuing to manage the company successfully, it is necessary in addition to prove some measure of exploitation of the minority. [Emphasis added.]

pression of the majority by the minority." *Hockenberger v. Curry*, 191 Neb. 404, 406, 215 N.W. 2d 627, 628 (1974). These general principles do not apply in the case *sub judice*, however. The circumstances which give rise to relief under our involuntary dissolution statutes are so infinitely varied that courts must determine if judicial intervention is necessary on a case by case basis. In this case, there is no evidence that Michael desires to place any undue pressure on Ira or that Michael is misusing our involuntary dissolution statute for his benefit. There is a plethora of evidence to suggest that Ira's actions have irreparably harmed Michael.

For the foregoing reasons, and considering the range of options available to our courts under G.S. 55-125.1 — for example, cancelling or altering any provision in the charter or bylaws of the corporation, cancelling, altering, or enjoining any resolution or act of the corporation, directing or prohibiting acts of directors or shareholders, and forcing a "buy-out" — we hold that the trial court misapplied the applicable law *and* abused its discretion by concluding that relief, other than dissolution, under G.S. 55-125.1 was not reasonably necessary for Michael's protection.

### III

[2] By his second argument, Michael, as minority shareholder, and on behalf of the defendant corporations, seeks to recover from Ira the profits that have accumulated in Republic, a corporation which is owned solely by Ira. Michael contends that Republic drained off profits which would have otherwise belonged to Eastern, the parent corporation. He also contends that Ira, as director, officer, and majority shareholder of Eastern, had a fiduciary duty not to enter into a contract providing profits only for himself. Ira, on the other hand, contends that the management contract between Republic and Eastern was "just and reasonable" at the time it was executed, and that there was no violation of any fiduciary duty.

The relevant facts are not in dispute. Republic was organized in 1973, and Ira bought all of its outstanding stock for $300 cash. Beginning 1 August 1973, Republic agreed to perform management services for, and receive a management fee from, Eastern. By 31 December 1977, Republic had accumulated net earnings totalling $65,632.01, all of which came from Eastern and inured

solely to Ira's benefit by reason of his sole ownership of the stock. Michael repeatedly objected to Ira's sole ownership of Republic and insisted that either (a) he be allowed to share in its profits by buying one-half of the corporation, or (b) Republic be operated without profit.

On the evidence presented, the trial court made the following findings of fact relating to this claim:

I. A. The name of Republic Management Corporation was selected by H. B. Meiselman;

B. The elder Meiselman (H. B. Meiselman) had a management corporation involved in his business dealings for a number of years prior to the chartering of Republic Management Corporation;

C. The evidence is silent as to any bad faith exercised by Ira S. Meiselman in connection with the management company, and this Court makes this finding with full knowledge that Ira S. Meiselman signed the management agreement in his capacity as chief executive officer of the defendant corporations and as President of Republic Management Corporation.

D. Republic Management Corporation has retained earnings resulting from the management contract in the approximate amount of $61,000.00 covering a period of time of some five years, which earnings reached a peak in 1974 of $57,000.00 and plunged to a loss of $11,000.00 in 1975;

E. The uncontradicted evidence shows that virtually all of the retained earnings were accumulated during the exceptionally good years of 1973 and 1974 and that the corporation has since that time suffered losses of approximately $10,000.00 for which Republic Management Corporation has not sought reimbursement;

F. The plaintiff himself received salary from Republic Management Corporation, a company in which he has no equity and for which he has provided no compensable work;

G. The management contract between Republic Management Corporation and defendant Eastern Federal

Corporation was just and reasonable at the time it was executed.

Record on Appeal at 197.

Based on these findings of fact, the trial court concluded that "[t]here has been no actionable breach of fiduciary responsibility by any of the defendants which could incur liability to this plaintiff, and this claim for relief is denied and that count dismissed." In so doing, the trial court erred.

It does not matter that Republic was a successor to previous management companies which performed management services for the defendant corporations.[13] Nor is it relevant, for purposes of this litigation, that Michael received a salary from Republic even though he provided no compensable work.[14] What is important is this: Ira, as controlling shareholder and director of Eastern, cannot, over Michael's objection, enter into a contract that generates a profit for a corporation which he owns alone. Ira concedes that in North Carolina, directors, officers, and majority shareholders owe a fiduciary duty and obligation of good faith to minority shareholders as well as to the corporation. *See Loy v. Lorm Corp.*, 52 N.C. App. 428, 278 S.E. 2d 897 (1981). Although written seventy years ago, the following words from *Pender v. Speight*, 159 N.C. 612, 615, 75 S.E. 851, 852 (1912), still state the applicable law.

Directors of a corporation are trustees of the property of the corporation for the benefit of the corporate creditors, as well as shareholders. It is their duty to administer the trust assumed by them, not for their own profit, but for the mutual benefit of all parties interested; and, when such directors receive an advantage to themselves not common to all, they are guilty of a plain breach of trust.

13. As early as 1951, Mr. Meiselman formed a management company, Fran-Mack Theaters, Inc., to provide management services to the other interrelated corporations at a fixed management fee. Union Management, Inc., succeeded Fran-Mack Theaters, Inc., but two weeks after Mr. Meiselman's disproportionately large transfer of stock to his son Ira in March 1971, Republic was formed to take over management of the interrelated corporations.

14. According to Ira, Republic "paid Michael a total of nearly $200,000 in 'salary' between 1973 and 1979."

(*See also* Robinson, *North Carolina Corporation Law and Practice*, § 12-5, at 232 (2d ed. 1974).) G.S. 55-35 restates and reinforces those common law principles announced in *Pender* by declaring that

> [o]fficers and directors shall be deemed to stand in a fiduciary relation to the corporation and to its shareholders and shall discharge the duties of their respective positions in good faith, and with that diligence and care which ordinarily prudent men would exercise under similar circumstances in like positions.

On the basis of strong and consistent case law and the codification of the relevant common law principles in our statutory law, we conclude that the trial court erred as a matter of law in finding "no actionable breach of fiduciary responsibility . . . ." This conclusion by the trial court was based in part upon what was labeled a finding of fact, but what was in reality, a conclusion of law, to wit: "The management contract between Republic Management Corporation and defendant Eastern Federal Corporation was just and reasonable at the time it was executed." The trial court did not detail findings to support either of these conclusions. We conclude, as did Michael in his brief, that "a decision permitting Ira to retain the profits diverted into his solely owned corporation, even if he acted innocently and in good faith, would be a rejection of those safeguards against self-dealing and the mistreatment of minority shareholders that have long characterized the corporation law of this State."

### IV

Having failed to present and discuss in his brief Assignment of Error No. 3, relating to the trial court's award of judgment to Eastern under its counterclaim, we deem as abandoned any question raised by Michael in this Assignment of Error. Rule 28(a), Rules of Appellate Procedure.

SUMMARY

The trial court misapplied the applicable law and abused its discretion in determining that judicial intervention was not reasonably necessary to protect the interests of Michael as minority shareholder or otherwise appropriate under the circumstances of the case. The judgment denying Michael the alter-

native relief he sought is therefore reversed and the case is remanded to the trial court for the determination of an appropriate remedy under G.S. 55-125.1 that is reasonably necessary to protect Michael's rights and interests.

The judgment in the derivative action is reversed, and the case is remanded to the trial court for entry of judgment on behalf of the defendant corporation against Ira, as sole owner of Republic, in the total amount of the profits accumulated to date in Republic plus interest and cost of this action.

Reversed and remanded.

Judge WELLS concurs.

Judge HILL dissents.

Judge HILL dissenting.

The subject of this controversy is a closely held family corporation or corporations originally organized and developed by the father of the plaintiff and later his defendant brother, Ira Meiselman. The corporate structure grew steadily under the elder Meiselman's management as it has under the direction of defendant. Their parents brought the sons, Michael and Ira, into the business. Ira succeeded; Michael did not. The father recognized this in his organization of the holding company, Eastern Federal Corporation. He originally gave the sons equal shares of stock in the companies. He rewarded Ira disproportionately, however, with a larger gift of shares in the holding company.

Through his shares in Eastern Federal Corporation, Ira exercised corporate control. In less than ten years he increased the book value of the corporations 350%—to $11,168,778.00—and Michael benefited proportionately through his shares. The company pays dividends regularly, and Michael's annual share usually totals a tidy $60,000. The principal portion of the earnings is "plowed back" into the company as growth, and Michael benefits from this through increased book value of his stock.

Michael says he ought to be receiving more dividends. He complains that he is not benefiting from the sums "plowed back" into the company. Perhaps he is not benefiting, at least not in the

sense that he can squander his wealth. Yet, his holdings and wealth increase regularly. He says his brother fired him from his job in the business. The record indicates, however, that Michael did not meet the demands of the job.

I find no quarrel with the findings of fact by the trial judge. They support the judge's conclusions. Nor do I believe the legislature intended that any disgruntled minority stockholder may compel his fellow majority stockholders in the company to acquire his interest or otherwise bail him out simply when established, legitimate, corporate policy does not coincide with his judgment.

Had there been a change in policy under Ira; had there been evidence of mismanagement by Ira or any evidence that Michael was receiving less now than he was during the years when he was active in the affairs of the business; had there been facts to show Michael had exhausted his efforts to sell his shares to another, or that Michael had attended stockholders' meetings and exhausted his rights, or that he really tried to work in the business faithfully and efficiently; then, perhaps the findings by the trial judge would have been different.

I do not read G.S. 55-125(a)(4) as a tool to compel a change in the established policy of a corporation committed to growth to one of dividend payout, simply upon showing that the minority stockholder desires to receive more dividend payout.

The problem is not one of deadlock and dissolution. Rather, it is one of corporate direction. I must conclude that, under the circumstances, the majority stockholder has simply continued the corporate goals established long ago by the corporation in which the brothers inherited stock—and he has succeeded amazingly well. I find no abuse of discretion on the part of the trial judge.

Nor am I convinced that Republic, a management corporation solely owned by Ira, is unduly draining off profits which actually belonged to Eastern, the major or parent corporation, and that Ira, as director, officer, and majority stockholder of Eastern, had a fiduciary duty not to enter into the contract which would provide profits for himself. The record shows the management contract between Republic and Eastern at the time it was executed was "just and reasonable." The record further shows Republic en-

joyed profits and suffered losses over the years. It shows further that the plaintiff was paid a salary from Republic, even though he provided no compensable services. Again, I concur in the findings of fact made by the trial judge that there has been no actionable breach of duty or fiduciary responsibility on the part of the defendants.

I vote to affirm the decision of the trial judge.