MICHAEL A. GREEN AND DANIEL J. GREEN, PLAINTIFFS v. JACK L. FREEMAN, JR., CORINNA W. FREEMAN, PIEDMONT CAPITAL HOLDING OF NC, INC., PIEDMONT EXPRESS AIRWAYS, INC., PIEDMONT SOUTHERN AIR FREIGHT, INC., AND NAT GROUP, INC., DEFENDANTS v. LAWRENCE J. D'AMELIO, III, THIRD-PARTY DEFENDANT

No. COA11-548

(Filed 4 September 2012)

**1. Fiduciary Relationship—breach of duty—company officer—minority shareholders—sufficient evidence**

The trial court did not err in a breach of fiduciary duty case by denying defendant's motions for directed verdict and judgment notwithstanding the verdict. Plaintiffs presented sufficient

evidence that defendant was an officer or director in the Piedmont companies and a majority shareholder and therefore, owed a fiduciary duty to plaintiffs as minority shareholders; that defendant breached such duty; and that such breach was the proximate cause of plaintiffs' injury.

**2. Corporations—piercing corporate veil—sufficient evidence**

The trial court did not err by denying defendant's motions for directed verdict and judgment notwithstanding the verdict as to plaintiffs' claim for piercing the corporate veil. Plaintiffs offered sufficient competent evidence to show that plaintiff and the other defendants had domination and control over the Piedmont companies; that plaintiff used her control of the companies' finances to her personal benefit; and that her actions were the proximate cause of plaintiffs' loss of their investment monies.

**3. Unfair Trade Practices—transactions in or affecting commerce—insufficient evidence**

The trial court did not err in an unfair or deceptive business practices case by allowing defendant's motion for summary judgment. Plaintiffs failed to offer sufficient evidence that the transactions between plaintiffs and defendants occurring within Piedmont companies' business and based on investments or loans plaintiffs provided for defendants to start the new venture was "in or affecting commerce."

**4. Appeal and Error—remaining arguments—agency—not addressed—harmless error**

The Court of Appeals declined to address plaintiffs' remaining arguments that the trial court committed reversible error by granting defendant's motion for directed verdict and dismissing their claims against defendant based on agency. The Court of Appeals affirmed the trial court's judgment and these alleged errors would have amounted to harmless error.

Appeal by defendant Corinna Freeman and cross-appeal by plaintiffs from judgment entered 2 June 2010 and order entered 8 July 2010 by Judge Edwin G. Wilson, Jr. and order entered 6 October 2008 by Judge Ronald Spivey in Superior Court, Guilford County. Heard in the Court of Appeals 16 November 2011.

*Thomas B. Kobrin, for plaintiff-appellants.*

*Forman Rossabi Black, P.A., by T. Keith Black, and Gavin J. Reardon, for defendant-appellant Corinna Freeman.*

STROUD, Judge.

Corinna Freeman ("defendant Corinna") appeals from the trial court's partial denial of her motions for directed verdict and the denial of her motion for judgment notwithstanding the verdict.[1] Michael A. Green and Daniel J. Green ("plaintiffs") cross-appeal from the trial court's rulings granting defendant Corinna's motion for partial summary judgment and directed verdict, and not permitting the introduction of defendants' depositions into evidence at trial. For the following reasons, we affirm the trial court's orders and judgment.

## I. Background

On 6 December 2006, plaintiffs filed a complaint against Jack. L. Freeman, Jr., and Corinna W. Freeman, individually; Piedmont Capital Holding of NC, Inc.; Piedmont Express Airways, Inc.; Piedmont Southern Air Freight, Inc.; and Nat Group, Inc. (referred to herein collectively as "defendants"). Plaintiffs alleged claims for (1) piercing the corporate veil; (2) fraud; (3) breach of contract; (4) conversion; (5) unjust enrichment; (6) breach of fiduciary duty; (7) Chapter 75-1.1 unfair or deceptive business practices[2]; (8) breach of contract, specifically against Nat Group, Inc.; and (9) tortious interference with a contract. After filing their answers to plaintiffs' complaint, defendants, on 21 December 2007, moved for leave to file a third-party complaint against Lawrence J. D'Amelio, III ("defendant Lawrence"), seeking claims for indemnification and contribution, which was granted by order entered 7 February 2008. By order entered 12 February 2008, plaintiffs were permitted to amend their complaint to insert allegations against third-party defendant Lawrence. By order entered 6 October 2008, the trial court granted partial summary judgment, dismissing plaintiffs' claims for fraud, breach of contract, and the Chapter 75-1.1 claim against defendant Corinna but denied her

---

1. Defendants Piedmont Capital Holding of NC, Inc., Piedmont Express Airways, Inc., Piedmont Southern Air Freight, Inc., individual defendant Jack L. Freeman, Jr., and third-party defendant Lawrence J. D'Amelio, III are not parties to this appeal.

2. We note that although the parties refer to plaintiffs' claim as "unfair and deceptive trade practices" or UDTP, N.C. Gen. Stat. § 75-1.1 does not include the word "trade" in this claim. Therefore, we will refer to this specific claim as a "unfair or deceptive business practices" or as a "Chapter 75-1.1" claim.

motion as to the claims of conversion, unjust enrichment, breach of fiduciary duty, and piercing the corporate veil. By orders entered 31 December 2008, the trial court granted plaintiffs' motions to amend their complaint and to reconsider its 6 October 2008 order. The trial court modified the 6 October 2008 summary judgment ruling to allow plaintiffs to proceed against defendant Corinna "for fraud, breach of contract and unfair and deceptive [business] practices under the theory of agency[.]" On 6 January 2009, plaintiffs filed an amended complaint to include allegations regarding agency, pursuant to the trial court's order. The individual defendants filed their answers to plaintiffs' second amended complaint. These claims were tried at the 15 February 2010 Civil Session of Superior Court, Guilford County. Evidence presented by plaintiffs tended to show the following: Plaintiff Michael Green ("plaintiff Michael") met defendant Jack Freeman, Jr. ("defendant Jack") in 2005. Defendant Jack told plaintiff Michael that he was looking for investors for an air freight enterprise for which he had secured a contract to work with the United States Department of Defense ("DOD"). Prior to his investment, plaintiff Michael received from defendant Jack and third-party defendant Lawrence, a partner in this new venture, several business summaries and descriptions. These documents stated that this new venture already had necessary agreements and certifications with the DOD and the "US Bank" "to provide transportation for cargo, property and personnel worldwide"; a contract with the United States Postal Service ("USPS") to transport air cargo a contract to provide passenger air service for a casino in Las Vegas, Nevada; a trucking company, Piedmont Express, which was established in 1995, to transport and store ocean containers and projected profits of over $1 million. Defendants Jack and Lawrence told plaintiff Michael that they were turning away business because they did not have the $100,000.00 necessary to secure a surety bond to do business with the DOD or to lease the airplane necessary for the USPS contract. They needed investments to get a surety bond and to encourage other investors. These representations convinced plaintiff Michael to invest in the new venture.

Plaintiff Michael decided to invest $200,000.00 in the new venture and his brother plaintiff Daniel Green ("plaintiff Daniel") also invested $200,000.00, based on plaintiff Michael's representations about the new venture. An investment proposal given to plaintiff Michael stated that his investment would be used first to obtain the surety bond necessary for the DOD contract and then they would "begin the process of implementing airline routes to move USPS mail."

Also, in exchange for their investment, plaintiffs were to get an ownership interest in the new venture and plaintiff Michael was to get a sales job.

On 22 November 2005, an operating agreement for Piedmont Capital Holding of NC, Inc.; Piedmont Express Airways, Inc.; and Piedmont Southern Air Freight, Inc. ("the Piedmont companies") was entered into to start this new venture.[3] This agreement listed officers for the Piedmont companies as follows: defendant Jack as chief executive officer; defendants Corinna and Jack as "Chairperson[;]" defendant Lawrence as president, treasurer, and chief operating officer; and plaintiff Michael as vice president. It also listed shareholders as follows: defendant Corinna, with a majority of 33 shares; plaintiff Michael with 12 shares; and plaintiff Daniel with 5 shares.[4] On the same date, plaintiffs and defendants Lawrence and Jack, on behalf of the Piedmont companies, entered into a loan agreement, stating that the investment monies were only for the security bond, operational expenses were not to exceed $100,000.00, salaries were only to be paid when the company was "making money[,]" and the investment monies were to be put into an account to which only plaintiff Michael had access. Also, on the same date, defendant Lawrence, as president of the Piedmont companies, signed two promissory notes to plaintiffs Michael and Daniel for $200,000.00, respectively.[5]

The investment money was deposited by defendant Lawrence under the corporate name Piedmont Capital Holding of NC Inc. into two First Citizen Bank accounts, with $200,000 in a business checking account and $200,000 in a money market savings account, which was to be used to encourage further investment but not for operational expenses. There was also an additional Wachovia business checking account for "Piedmont Express Airways[.]" This account

3. This "operating agreement" also states that the Piedmont companies are "a limited liability company[.]" However, in August of 2005, articles of incorporation were filed with the North Carolina Department of the Secretary of State for "business corporations" Piedmont Capital Holding of NC, Inc. and Piedmont Express Airways, Inc. listing defendant Lawrence as the registered agent.

4. Elizabeth F. D'Amelio also owned 25 shares and Beth Clay owned 25 shares, but are not parties to this action.ing the rights of the parties.

5. We recognize that as plaintiffs were investing in the Piedmont companies with the intention of becoming shareholders, there would appear to be no reason for these funds to be treated as a loan or for any promissory note to be executed. Despite the legal and logical inconsistency of these acts, this is what the evidence shows and is thus part of the failure of the defendants to observe proper corporate formalities in the formation of the Piedmont companies.

was opened by defendant Corinna's late husband Jack Freeman, Sr., and defendant Corinna, signing as "CEO/OWNER[.]" There were also business credit cards, an American Express business credit card in defendant Corinna Freeman's name "C. Freeman PSA Airline" and a Wachovia credit card in the name of "C. Freeman." Plaintiff Michael testified that he was given a sales job with the Piedmont companies but learned that there were not any DOD contracts, USPS contracts, or any warehouse storage for ocean containers. He was repeatedly told by defendants Jack and Lawrence that $100,000.00 of his money would be to get the surety bond and all that plaintiffs could lose would be $100,000.00 for the bond. Defendant Jack was CEO and ran the business and defendant Lawrence controlled the finances and accounts for the Piedmont companies. Based on the promise by defendant Jack of a big sales account, on 26 January 2006, the ownership interests in the Piedmont companies were amended as follows: defendant Corinna owned 88 shares; plaintiff Michael owned 10 shares, and plaintiff Daniel owned 4 shares. This change of ownership interest was signed by plaintiffs and defendant Jack on behalf of defendant Corinna. After this change in ownership interest, plaintiff Michael's name was taken off the business bank accounts.

Shortly after the plaintiffs' money was deposited into the First Citizens business accounts, plaintiff Michael, and defendants Jack and Lawrence were paid weekly salaries. In addition to his salary, defendant Lawrence was also paid from December 2005 until March 2006 out of the First Citizen accounts over $40,000, including approximately $4,000 in "reimbursement" of expenses and a $10,000 "loan." In addition to his salary, defendant Jack was paid from December 2005 until April 2006 out of the Piedmont companies accounts around $36,000.00, including over 24 "reimbursements" for expenses. Also, from January 2006 until May 2006, the business First Citizen account was used to pay over $20,000.00 charged to the American Express credit card and over $11,000.00 charged to the Wachovia credit card. Credit card records and bank records showed that most of these reimbursement and expenses charged to the credit cards were for food and entertainment. From December 2005 until July 2006, there were expenditures of over $34,000.00 in food expenses, $3,600 in tips, and $1,000 for entertainment. Defendant Jack reassured plaintiff Michael that the company was doing well but he had doubts because there was no money coming in and the assets were being depleted at a rapid rate. Plaintiff Michael stopped drawing a salary in May 2006 because of concerns that they were not making sales. Even though the Piedmont companies made some ground shipment sales, no

money from any sales was ever deposited in the business accounts at the Piedmont companies and by June 2006 it was insolvent. The Piedmont companies also never obtained the surety bond. Plaintiff Michael never received any stock certificates from the Piedmont companies and no shareholder meetings were ever held. Neither the individual defendants nor the Piedmont companies ever repaid plaintiffs' loan. At the end of the presentation of plaintiffs' evidence, the trial court dismissed the individual claim of conversion against defendant Corinna.

Defendant Jack testified that in 2005 he and defendant Lawrence started talking about going into business together. He met plaintiff Michael in 2005, who was interested in investing in the new venture. Defendant Lawrence was to find investors and defendant Jack was to acquire an airplane to secure the postal and DOD contracts, which would require a $100,000 bond that they did not have; they worked out of office space provided by defendant Lawrence in his law offices. Defendant Jack stated that defendant Lawrence made the representations to plaintiff Michael prior to his investment; he did not tell plaintiff Michael that they had contracts before his investment; he did not sign the promissory notes or give permission, as CEO, to defendant Lawrence to sign the promissory notes on behalf of the Piedmont companies; it was defendant Lawrence that opened the business accounts at First Citizens bank; defendant Lawrence kept track of the business accounts for the Piedmont companies; he did not approve all of the checks written out of those accounts; the Wachovia checking account was for Piedmont Southern Air Freight, opened by his parents, and was used as his personal checking account, since he had filed bankruptcy and could not get an account in his name; the Wachovia checking account was not part of the new venture with plaintiffs; the expenses paid by the First Citizen's checking accounts on the credit cards were reimbursements for business expenses incurred while he was working in North Carolina and Florida, not for personal expenses; he was able to get an airplane for the Piedmont companies through a deal with Nat. Group, Inc.; defendant Lawrence would not approve the money for the surety bond needed for the DOD contracts; he did not know about the withdrawals from the First Citizens money market account; and he had made sales for the Piedmont companies but did not know what happened to the proceeds from these sales or why they were not deposited in the business account. He admitted that he lived in a house owned in part by his mother and his ex-wife and he paid the mortgage for this property, Direct TV bills, power bills, and insurance

from the Piedmont companies' business accounts. He further admitted that several checks from Nat Group, Inc., as part of a deal that was never finalized, were deposited in the Wachovia account for him, while he still was earning a salary from the Piedmont companies. As to his mother defendant Corinna, defendant Jack testified that she never used the credit cards; the credit cards, along with the Wachovia account, were set up prior to the new venture; she was the owner of Piedmont Southern Air Freight, for a time, but had given him control of the company in 2001; and he never consulted his mother defendant Corinna before putting her in the operating agreement for the Piedmont companies.

Defendant Lawrence testified that it was defendant Jack's idea to put the ownership of the Piedmont companies in defendant Corinna's name, so it would look like it was a minority-owned company. However, defendant Lawrence stated that defendant Corinna did not exercise any authority or control over the company and he reported to defendant Jack, who was running the company as CEO. There were no shares of stock issued, no elections of officers, no shareholder meetings or directors meetings, and no corporate books kept. He turned over control of the Piedmont companies' bank accounts to defendant Jack in mid-January 2006 after he resigned as President; he did not know about the credit cards or the Wachovia business account; defendant Jack would not allow him to pay the $100,000.00 to get the surety bond; defendant Jack authorized him to sign the promissory notes; and the $10,000.00 from the First Citizen's account was to reimburse him for expenses that he had fronted for the companies such as health insurance, dental insurance, and computer and phone expenses. Defendant Corinna was present at trial but did not testify.

At the end of the presentation of all evidence, plaintiffs dismissed their claims against defendant Nat. Group. Inc. Also, defendant Corinna moved for directed verdict on all claims. The trial court granted in part her motion, dismissing all claims against her for fraud, breach of contract, and unfair or deceptive business practices under a theory of agency and the unjust enrichment claim, but denied her motion regarding plaintiffs' claims against her for piercing the corporate veil and breach of fiduciary duty.

On 24 February 2010, a jury returned verdicts in favor of plaintiffs. Specifically, the jury found the following:

6. Did the defendant Corinna W. Freeman control Piedmont Capital Holding of NC, Inc. or Piedmont Express Airways, Inc., or Piedmont Southern Air Freight, Inc., with regard to the acts or omissions that damaged the plaintiffs?

ANSWER ____YES

. . . .

18. Were the plaintiffs damaged by the failure of the defendant Corinna W. Freeman to discharge her duty as a corporate director or officer?

ANSWER: ____YES

19. What amount are the plaintiffs entitled to recover from the defendant Corinna W. Freeman?

ANSWER: ___$400,000

On 5 March 2010, plaintiffs filed a motion requesting that the trial court reconsider its dismissal of plaintiffs' Chapter 75-1.1 claims as the jury result mandated a finding of "unfair and deceptive [business] practices" and requesting the trial court to enter judgment in conformity with the jury verdict and award treble damages. On 10 March 2010, defendant Corinna filed a motion for judgment notwithstanding the verdict ("JNOV") and in the alternative for a new trial. On 2 June 2010, the trial court entered a judgment consistent with the jury's verdict, ruling that individual defendants Jack Freeman, Jr., Corinna Freeman, and Lawrence D'Amelio were jointly and severally liable to plaintiffs for the sum of $400,000.00 with interest. By order entered 8 July 2010, the trial court denied plaintiffs' motion to reconsider and defendant Corinna's motions for a JNOV or a new trial. On 17 August 2010, defendant Corinna Freeman filed a notice of appeal from (1) the trial court's 2 June 2010 judgment; and (2) the 8 July 2010 order denying the parties' post-trial motions. On 26 August 2010, plaintiffs' appealed from (1) the 8 July 2010 order denying the parties' post-trial motions; (2) the 6 October 2008 order granting in part and denying in part defendant Corinna's motion for summary judgment; and (3) the 2 June 2010 judgment. We will address defendant Corinna's appeal first.

## II. Defendant Corinna Freeman's appeal

On appeal, defendant Corinna Freeman contends that the trial court erred in denying her motions for a directed verdict and JNOV. She argues that as to the claim of breach of fiduciary duty "plaintiffs

failed to adduce competent evidence" that she (a) owed them a fiduciary duty, (b) that she breached any such duty, or (c) that any wrongful action or inaction by her "was the proximate cause of any injury to [plaintiffs.]" As to plaintiffs' claim for piercing the corporate veil, she argues that (a) she was not in a position of domination or control of any of the defendant companies; (b) she did not use any position of dominance or control to breach any duty to plaintiffs; and (c) her actions were not the proximate cause of any loss complained of by plaintiffs in this action. Defendant Corinna requests that "this Court reverse the trial court's denial of those motions, and remand the matter with instructions that JNOV be entered in her favor on both such issues, and that all claims against her be dismissed with prejudice."

A.  Standard of Review

> The standard of review of the denial of a motion for a directed verdict and of the denial of a motion for JNOV are identical. We must determine whether, upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury.

> A motion for either a directed verdict or JNOV should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim. A scintilla of evidence is defined as very slight evidence.

*Springs v. City of Charlotte*, ____ N.C. App. ____, ____, 704 S.E.2d 319, 322-23 (2011) (citations and quotation marks omitted); *see Hodgson Constr., Inc. v. Howard*, 187 N.C. App. 408, 412, 654 S.E.2d 7, 11 (2007) (emphasizing that "[t]he standard is high for the party seeking a JNOV: the motion should be denied if there is more than a scintilla of evidence to support the plaintiff's *prima facie* case." (citation and quotation marks omitted)), *disc. review denied*, 362 N.C. 509, 668 S.E.2d 28 (2008). Evidence which tends to contradict the plaintiff's evidence must be disregarded in this analysis. On a motion for JNOV

> any of defendant's evidence which tends to contradict or refute plaintiff's evidence is not to be considered, but the plaintiff is entitled to the benefit of defendant's evidence which is favorable to plaintiff, *Overman v. Products Co.*, 30 N.C. App. 516, 227 S.E.2d 159 (1976), or which tends to clarify plaintiff's case, *Home*

*Products Corp. v. Motor Freight, Inc.*, 46 N.C. App. 276, 264 S.E.2d 774, *disc. review denied*, 300 N.C. 556, 270 S.E.2d 105 (1980).

*Koonce v. May*, 59 N.C. App. 633, 634, 298 S.E.2d 69, 71 (1982).

Therefore, "a motion for judgment notwithstanding the verdict is cautiously and sparingly granted." *Hodgson Constr., Inc.*, 187 N.C. App. at 411, 654 S.E.2d at 10 (citation and quotation marks omitted). We have further stated that "our review of [a] motion for judgment notwithstanding the verdict is *de novo*. Therefore, we consider the matter anew and . . . freely substitute our judgment for that of the trial court[.]" *Id.* at 412, 654 S.E.2d at 11.

B. Breach of Fiduciary Duty

**[1]** Defendant Corinna argues that the trial court erred in denying her motions for directed verdict and JNOV, as plaintiffs did not present any evidence that she (a) owed them a fiduciary duty, (b) that she breached any such duty, or (c) that any wrongful action or inaction by her "was the proximate cause of any injury to [plaintiffs.]"

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citations omitted). A fiduciary relationship has been defined as

> one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] 'it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*' "

*Id.* at 651, 548 S.E.2d at 707-08 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (emphasis in original)).

"Under North Carolina law, directors of a corporation generally owe a fiduciary duty to the corporation, and where it is alleged that directors have breached this duty, the action is properly maintained by the corporation rather than any individual creditor or stockholder." *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 248, 567 S.E.2d 781, 786-87 (2002) (emphasis omitted) (citations omitted), *aff'd per curiam*, 357 N.C. 46, 577 S.E.2d 620 (2003). However, this Court has held that directors, officers, and majority shareholders owe a fiduciary duty to minority shareholders.

*Meiselman v. Meiselman,* 58 N.C. App. 758, 774-75, 295 S.E.2d 249, 259-60 (1982) (reversing the trial court ruling and affirming the plaintiff minority shareholder's argument that the majority shareholder, director, and officer had a fiduciary duty not to enter into a contract providing for profits only to the majority shareholder), *affirmed in part and modified in part by,* 309 N.C. 279, 307 S.E.2d 551 (1983). The Supreme Court in *Meiselman* further defined part of that duty, in the corporate opportunity doctrine, as follows:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

309 N.C. at 308, 307 S.E.2d at 568 (quoting *Guth v. Loft, Inc.,* 23 Del. Ch. 255, 270, 5 A. 2d 503, 510 (1939)). "This Court has held that breach of fiduciary duty is a species of negligence or professional malpractice. Consequently, these claims require[] proof of an injury proximately caused by the breach of duty." *Farndale Co., LLC v. Gibellini,* 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006) (citations and quotation marks omitted).

1. Fiduciary Duty

Defendant Corinna argues that plaintiffs failed to show any evidence of two essential elements necessary to establish a fiduciary duty: (1) that plaintiff actually reposed confidence in her, the alleged fiduciary and (2) that confidence resulted in her having domination and influence over plaintiffs. Defendant Corinna argues that plaintiffs

never offered any evidence they reposed any confidence in her as they admitted she never made any representations to them, she never spoke or provided them with any written communications, and they never met her; but it was plaintiff Daniel that reposed confidence in his brother plaintiff Michael, who relied exclusively on representations from defendants Jack or Lawrence. Likewise, defendant Corinna argues that plaintiffs presented no evidence of dominion and control, as plaintiffs never "claimed that [she] had any influence over them" and her only interest if any "was as a minority shareholder without the ability to force any decisions." Defendant Corinna further argues even though a director of a corporation would have a fiduciary duty, that "the issue of director liability should not have been allowed to go to the jury because <u>there was no evidence that [she] even was a director.</u>" (Emphasis in original.) Defendant Corinna further contends that even if she were a director or officer, "directors and officers have no fiduciary duties to shareholders (as individuals), creditors, or to other directors except under special circumstances, none of which apply in the present case." Defendant Corinna argues that if she was an officer it was as "Chairperson" but her authority was specifically limited to organizing meetings and she did not have any discretionary authority over any operations, financial or voting rights, which would not rise to any fiduciary relationship. Plaintiffs counter that there was sufficient evidence presented showing that defendant Corinna was an officer or director in the Piedmont companies to establish a fiduciary duty and to support the denial of defendant's motion for a directed verdict and JNOV.

Plaintiffs' claims for breach of fiduciary duty were based on a duty owed to plaintiffs "as shareholders and investors" and defendants "[a]s directors, officers and employees of the Piedmont Companies[.]" Although defendant Corinna did not testify at trial, there were several documents introduced into evidence illustrating her involvement in the Piedmont companies. In the operating agreement for Piedmont Capital Holding of NC, Inc.; Piedmont Express Airways, Inc.; and Piedmont Southern Air Freight, Inc., defendant Corinna, in a listing of corporate "officer[s,]" is specifically named as the "Chairperson[.]" A reasonable inference from this evidence would be that defendant Corinna was in an corporate officer position named "Chairperson" or it could also be inferred that she was "Chairperson" for the board of directors or in this case shareholders. This same operating agreement listed defendant Corinna owning a majority interest of 33 shares and plaintiffs Michael and Daniel as minority shareholders of the Piedmont companies, owning 12 shares and 5

shares, respectively. Later, defendant Corinna became the exclusive majority owner with 86% of the shares on 26 January 2006, with plaintiffs Michael and Daniel owning the remaining shares. In an application to Wachovia Bank for a company checking account in 2005, defendant Corinna listed herself as "CEO" of Piedmont Express Airways, Inc., one of the Piedmont companies. No evidence was presented that she resigned as CEO. This designation would further the inference that she was an officer in the Piedmont companies. On documents filed with the North Carolina Secretary of State, she used the designation "Owner/Chairperson" when she signed and filed those documents for Piedmont Southern Air Freight, Inc., one of the Piedmont companies. Likewise, this would further the inference that she was chairperson of the directors or shareholders. Viewing this evidence in the light most favorable to plaintiffs and giving plaintiffs the benefit of every reasonable inference drawn therefrom, we hold that a juror could reasonably infer that defendant Corinna was an officer or director in the Piedmont companies and a majority shareholder and therefore, owed a fiduciary duty to plaintiffs as minority shareholders. *Springs*, ____ N.C. App. at ____, 704 S.E.2d at 322-23; *Meiselman*, 58 N.C. App. at 774-75, 295 S.E.2d at 259-60.

2. Breach

Defendant Corinna argues that there was also no showing by plaintiffs that she breached any fiduciary duty owed to them because evidence showed that she never made any false representations to them, wrongfully failed to disclose any information to them, used her influence "in any manner contrary to their interests, wrongfully, or otherwise[,]" or took "part in direct[ing], or control, any of the actions of which plaintiffs complain." Plaintiffs counter that evidence was presented that defendant Corinna improperly diverted for her own personal use corporate funds from the Piedmont companies and failed to do anything to stop "the complete wastage of the corporate assets[.]"

At trial, evidence was presented that mortgage payments, Direct TV bills, and other utility bills for real property co-owned by defendant Corinna were paid directly out of checking accounts belonging to the Piedmont companies. The jury could easily and reasonably draw an inference that defendant Corinna knew how her own personal financial obligations were being paid. Certainly, she knew that she herself was not paying them, yet her house was not foreclosed and her utilities were not shut off for nonpayment. This would support an inference that defendant Corinna breached her fiduciary duty by using her "position of trust and confidence to further [her] private

interests." *See Meiselman*, 309 N.C. at 308, 307 S.E.2d at 568. Also plaintiff presented evidence that defendant Corinna was involved in the finances of the Piedmont companies. Documents allowed into evidence at trial, showed that she as "CEO/Owner" opened a Wachovia business account for Piedmont Express Airways, Inc. in January 2005 checks were signed by defendant Corinna from that account; a PSA American Express credit card was in the name of "C. Freeman/PSA Airlines" and she knew of the credit cards and she allowed defendant Jack to use them. Evidence was also presented that defendants Jack and Lawrence diverted money loaned to the Piedmont companies for their own personal uses. A juror could reasonable infer that although defendant Corinna had some control over the finances of the Piedmont companies, she did nothing to prevent the "wastage" and malfeasance by the other officers of the corporation, thereby breaching her fiduciary duty as an officer or majority shareholder of the Piedmont companies. *See Meiselman*, 309 N.C. at 308, 307 S.E.2d at 568. Viewing this evidence in the light most favorable to plaintiffs and giving plaintiffs the benefit of every reasonable inference drawn therefrom, we hold that a jury could reasonable infer that defendant Corinna breached her fiduciary duty as an officer or majority shareholder in the Piedmont companies. *See Springs*, _____ N.C. App. at _____, 704 S.E.2d at 322–23.

3.  Proximate Causation

Defendant Corinna further argues that plaintiffs did not put forth any evidence that the breach of her fiduciary duty was a proximate cause of injury to plaintiffs but their own testimony showed that "if they were wrongfully injured *Jack's* actions, and *not Corinna's*, were the proximate cause of those injuries." (Emphasis in original.) But if defendant Corinna breached her fiduciary duty, it would be easy for a juror to infer that her use of the Piedmont companies funds for her personal expenses and failing to stop further "wastage" of the assets of the Piedmont companies by other company officers did proximately cause damage to plaintiffs in the form of loss of their investment monies, which are the subject of this action. Accordingly, we hold that the trial court did not err in denying defendant Corinna's motions for a directed verdict and JNOV as to plaintiffs' claims for breach of fiduciary duty.

We note that most of defendant Corinna's arguments point us to evidence refuting plaintiffs' contentions and evidence, but we are not to consider this evidence in our review from a trial court's ruling on directed verdict or JNOV. *See Koonce*, 59 N.C. App. at 634, 298 S.E.2d

at 71. As noted above, because there was "more than a scintilla of evidence supporting each element of" plaintiffs' claim, *see Springs*, \_\_\_\_ N.C. App. at \_\_\_\_, 704 S.E.2d at 322–23, the trial court did not error in denying defendant Corinna's motions for directed verdict and JNOV for this claim, and defendant Corinna's arguments are overruled.

C.  Piercing the Corporate Veil

[2]  Defendant Corinna next contends that the trial court erred in denying her motions for directed verdict and JNOV as to plaintiffs' claim for piercing the corporate veil because plaintiff failed to "adduce sufficient competent evidence to show" that (1) she had domination and control over the Piedmont companies; (2) she used any position of domination or control to breach any duty to plaintiffs; or (3) her actions were the proximate cause of any loss to plaintiffs.

This Court summarized liability based upon piercing of the corporate veil as follows:

> Our courts will disregard the corporate form and pierce the corporate veil where an individual exercises actual control over a corporation, operating it as a mere instrumentality or tool. Under these circumstances, the controlling individual is liable for the torts of the corporation. The instrumentality rule has been set forth by our Supreme Court as follows:

> When a corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person, it being immaterial whether the sole or dominant shareholder is an individual or another corporation.

> Liability may be imposed on an individual controlling a corporation as an instrumentality when he had:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or

other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 790-91, 561 S.E.2d 905, 908 (2002) (quoting *Glenn v. Wagner*, 313 N.C. 450, 455, 329 S.E.2d 326, 330 (1985)). Factors to consider in piercing the corporate veil include: Inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation so that it has no independent identity, and excessive fragmentation of a single enterprise into separate corporations. *Glenn*, 313 N.C. at 455, 329 S.E.2d at 330-31. Additional, factors "to be considered to determine whether sufficient control and domination is present to satisfy the first prong of the three-pronged rule known as the instrumentality rule" include "non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, nonfunctioning of other officers or directors, [and] absence of corporate records." *Id.* at 458, 329 S.E.2d at 332. However,

[i]t is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had no separate mind, will or existence of its own and was therefore the mere instrumentality or tool of the dominant [shareholders] or corporation.

*Id.* (citations and quotation marks omitted).

1. Domination or Control

Defendant Corinna argues that there was no evidence presented that would establish that she had domination and control of the Piedmont companies because evidence showed that she did not have authority to sign on behalf of the company; she never provided instruction to the CFO of the companies; she did not know that she was an officer in the Piedmont companies; as "Chairperson" her only authority was to organize and conduct meetings; no evidence presented that she ever invested in the companies or was issued any shares of stock; and there was no evidence she performed any managerial duties. Plaintiffs counter that they presented sufficient evidence of defendant Corinna's dominion and control of the Piedmont companies to support their claim for piercing the corporate veil.

Plaintiffs pursued the claim of piercing the corporate veil against all the individual defendants including defendant Corinna. A piercing the corporate veil claim can be brought against multiple parties or shareholders involved in the control. *See Glenn*, 313 N.C. at 454-56, 329 S.E.2d at 330-31. The jury found that all individual defendants did have control of the Piedmont companies. To support the claim that the Piedmont companies were mere instruments of all of the defendants, evidence showed that the Piedmont companies never became legal entities; no shareholders or directors meetings were held; no stock was issued; no corporate minute books or forms were made or kept; the Piedmont companies were undercapitalized; and by the time of trial, the Piedmont companies were insolvent. As to defendant Corinna, as discussed above, she had control over the finances of the Piedmont companies, as checking accounts were opened in her name as "owner" or "CEO[;]" checks were signed by defendant Corinna from business accounts; and one of the Piedmont companies credit cards was in her name. Also, defendants were the majority shareholders in the company, as defendant Corinna became the majority owner with 86% of the shares on 26 January 2006. In addition, all of the evidence as to what defendant Corinna did or did not know is based upon testimony of other witnesses—mainly defendants Jack and Lawrence--as defendant Corinna did not testify at the trial. The jury is the sole judge of the credibility of the evidence, *see Anderson v. Hollifield*, 345 N.C. 480, 483, 480 S.E.2d 661, 664 (1997), and given the conflicting stories told by defendants Jack and Lawrence, each attempting to blame the other, it is likely that the jury believed neither of them. Viewing the evidence in the light most favorable to plaintiffs and giving plaintiffs the benefit of every reasonable inference drawn therefrom, we hold that a jury could reasonable infer that defendant Corinna and the other defendants exercised sufficient domination and control over the Piedmont companies. *See Becker, Inc.*, 149 N.C. App. at 790-91, 561 S.E.2d at 908; *Springs*, ____ N.C. App. at ____, 704 S.E.2d at 322–23.

## 2. Breach

Defendant Corinna argues that assuming *arguendo* that she had domination and control, plaintiffs "adduced no evidence whatsoever that [she] personally did anything wrongful[,]" she was "never even called upon to perform her minimal ministerial duties[,]" and "[t]he only evidence before the jury of alleged acts of wrongdoing suggested wrongful acts done solely by [defendants] Jack and [Lawrence.]"

**GREEN v. FREEMAN**

[222 N.C. App. 652 (2012)]

As noted above, evidence was presented that defendant Corinna's mortgage payments, Direct TV bills, and utility bills were paid directly out of the Piedmont companies' checking accounts. Viewing this evidence in the light most favorable to plaintiffs, a juror could easily and reasonably draw an inference that defendant Corinna was using her control of the companies' finances to her personal benefit, "in contravention of plaintiff's legal rights" as investors and shareholders in the Piedmont companies. *See Becker*, 149 N.C. App. at 790-91, 561 S.E.2d at 908; *Springs*, ____ N.C. App. at ____, 704 S.E.2d at 322-23.

3. Proximate Causation

Defendant Corinna further argues that any breach was not a proximate cause of injuries to plaintiffs. If defendant Corinna used her control of the Piedmont companies to divert monies for her personal benefit, it would be easy for a juror to infer that her breach did proximately cause damage to plaintiffs in the form of loss of their investment monies, which are the subject of this action. As noted above, we disregard defendant Corinna's arguments based on contrary evidence. *See Koonce*, 59 N.C. App. at 634, 298 S.E.2d at 71. Accordingly, we hold that the trial court did not err in denying defendant Corinna's motions for a directed verdict and JNOV as to plaintiffs' claims for piercing the corporate veil. Thus, we overrule defendant Corinna's arguments.

### III. Plaintiffs' Appeal

Plaintiffs appeal from the trial court's order granting defendant Corinna's summary judgment motion and defendants Jack, Corinna, and Lawrence's motions for directed verdict dismissing their Chapter 75-1.1 claims. Plaintiffs also appeal from the trial court's dismissal of their claims against defendant Corinna based on agency and ruling that plaintiffs could not introduce depositions of defendants at trial.

A. Standard of Review

We apply a *de novo* review from a trial court's rulings for either summary judgment or directed verdict.

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. A trial court's grant of summary judgment receives

*de novo* review on appeal, and evidence is viewed in the light most favorable to the non-moving party.

*Mitchell, Brewer, Richardson v. Brewer,* ____ N.C. App. ____, ____, 705 S.E.2d 757, 764-65 (citations and quotation marks omitted), *disc. review denied,* 365 N.C. 188, 707 S.E.2d 243 (2011). As noted above, the standard of review for a ruling entered upon a motion for directed verdict

> is whether upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury. We apply *de novo* review to . . . a trial court's denial of a motion for directed verdict[.]

*Denson v. Richmond County,* 159 N.C. App. 408, 411, 583 S.E.2d 318, 320 (2003) (citations and quotation marks omitted).

B. Chapter 75-1.1 Claims

[3] Plaintiffs argue that there was sufficient evidence regarding its claim for unfair or deceptive business practices to survive defendant Corinna's summary judgment motion. Plaintiffs further argue that since there was sufficient evidence to support claims for breach of fiduciary duty and fraud, there was evidence of unfair or deceptive business practices as a matter of law. Plaintiffs conclude that since the trial court committed reversible error, this Court should remand to the trial court to enter judgment that all defendants committed unfair or deceptive business practices, and for the award of treble damages and attorney's fees. Defendant Corinna counters that the trial court did not err in granting her motion for summary judgment or granting defendants' motions for directed verdict at trial dismissing plaintiffs' claims for unfair or deceptive business practices, as plaintiffs failed to allege or present any evidence supporting that any breach by defendants was "in or affecting commerce[.]"

In order to establish a Chapter 75-1.1 unfair or deceptive business practices claim "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton,* 353 N.C. at 656, 548 S.E.2d at 711 (citation omitted). "Before a practice can be declared unfair or deceptive, it must first be determined that the practice or conduct which is complained

of takes place within the context of [§ 75-1.1's] language pertaining to trade or commerce." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001) (citation and quotation marks omitted). N.C. Gen. Stat. § 75-1.1(b) (2007) defines "commerce" as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession."

> Subsection (b) of this section of the Act defines the term "commerce" to mean "business activities." "Business activities" is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.

*Hajmm Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). Our Supreme Court has further explained that

> the General Assembly did not intend for [North Carolina's unfair and deceptive practices act's] protections to extend to a business's internal operations. . . . [T]he Act is not focused on the internal conduct of individuals within a single market participant, that is, within a single business. To the contrary, . . . the General Assembly intended the Act's provisions to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act. As the foregoing indicates, this Court has previously determined that the General Assembly did not intend for the Act to intrude into the internal operations of a single market participant.

*White v. Thompson*, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010) (citations omitted); *See also Oberlin*, 147 N.C. App. at 62, 554 S.E.2d at 848 (where the Court held that because the loan agreement was primarily a capital-raising device, it was not in or affecting commerce).

Plaintiffs brought claims for unfair or deceptive business practices against defendants based on allegations of fraud or misrepresentations in getting plaintiffs to invest in or lend money to the Piedmont companies; as officers and directors of the Piedmont companies in breaching their fiduciary duty to plaintiffs as shareholders and investors; and based on their breach of contracts, specifically the loan agreement and promissory notes. Therefore, plaintiffs' claims are based on transactions between plaintiffs and defendants occurring within Piedmont companies' business and based on investments or loans plaintiffs provided for defendants to start the new venture. However, raising capital is not a business activity contemplated

within the Act. *See Oberlin,* 147 N.C. App. at 62, 554 S.E.2d at 848. Therefore, plaintiffs have failed to show that the transaction was "in or affecting commerce." Accordingly, the trial court properly dismissed plaintiffs' Chapter 75-1.1 claims and plaintiffs' argument is overruled.

C. Agency and Defendants' Depositions

[4] Plaintiffs next contend that the trial court committed reversible error by granting defendant Corinna's motion for directed verdict and dismissing their claims against her based on agency because there was sufficient evidence presented to show that defendant Jack was defendant Corinna's agent. Plaintiffs further contend that the trial court committed reversible error by not permitting plaintiffs to introduce the depositions of defendants. Yet as to both of these arguments, plaintiffs admit that these errors would amount to harmless error if this Court affirms the trial court's judgment on the grounds discussed above, as their recovery would be the same either way. As we have affirmed the trial court's judgment, we agree with plaintiffs that there is no need to address these additional arguments as we are affirming the judgment for the reasons stated above and consideration of these issues would have no effect upon the outcome.

For the foregoing reasons, we affirm the trial court's orders and judgment.

AFFIRMED.

Judge BRYANT concurs.

Judge CALABRIA dissents in a separate opinion.

CALABRIA, Judge, dissenting.

I agree with the majority that the trial court properly dismissed Michael A. Green's ("Michael") and Daniel J. Green's ("Daniel") (collectively "plaintiffs") Chapter 75-1.1 claims. However, I find that the trial court erred by denying Corinna W. Freeman's ("Corinna") motions for directed verdict and JNOV on the issue of breach of fiduciary duty. I find the trial court also erred by denying Corinna's motions for directed verdict and JNOV on the issue of extending her liability for corporate obligations beyond the confines of a corporate separate entity by piercing the corporate veil. Therefore, I respectfully dissent.

## I.  Standard of Review

Upon a defendant's motion for directed verdict, the question "is whether the evidence, considered in the light most favorable to [the] plaintiff, is sufficient to take the case to the jury and to support a verdict for [the] plaintiff." *Barnard v. Rowland*, 132 N.C. App. 416, 421, 512 S.E.2d 458, 463 (1999). The motion should be denied "[i]f there is more than a scintilla of evidence to support plaintiff's *prima facie* case in all its constituent elements...." *Id.* (internal quotations and citation omitted). The same standard of review applies to a JNOV motion as to a motion for directed verdict. *Id.*

## II.  Fiduciary Duty

I agree with Corinna that the trial court committed reversible error by denying her motions for directed verdict and JNOV on the issue of director/officer liability because plaintiffs failed to adduce evidence of a fiduciary relationship, or evidence that Corinna personally breached any duty to plaintiffs proximately resulting in their harm.

### A.  Fiduciary Relationship

While normally a jury question, the plaintiff must provide sufficient evidence that a fiduciary relationship exists between the parties. *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 665-66, 391 S.E.2d 831, 832-33 (1990). "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Harrold v. Dowd*, 149 N.C. App. 777, 783, 561 S.E.2d 914, 919 (2002). In North Carolina, essentially one party has to "figuratively [hold] all the cards" for example, "all the financial power or technical information" to find that "the special circumstance of a fiduciary relationship has arisen." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008).

In North Carolina, "directors of a corporation generally owe a fiduciary duty to the corporation...." *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 26, 560 S.E.2d 817, 822 (2002). "[A] director, officer, or agent of a corporation is not, merely by virtue of his office, liable for the torts of the corporation or of other directors, officers, or agents." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001). However, "an officer of a corporation may be individually liable" for torts "in which he actively participates." *White v. Collins Bldg., Inc.*, ____ N.C. App. ____, ____, 704 S.E.2d 307, 310 (2011) (citation omitted). "A corporation has the officers described in its bylaws or appointed by the board of directors in accordance with

the bylaws." N.C. Gen. Stat. § 55-8-40(a) (2011). "Each officer has the authority and duties set forth in the bylaws...." N.C. Gen. Stat. § 55-8-41 (2011).

In the instant case, plaintiffs produced no evidence that Corinna was a director of Piedmont Capital Holding Of NC, Inc. ("PCH"), Piedmont Express Airways, Inc. ("PEA"), and Piedmont Southern Air Freight, Inc. ("PSAF") (collectively "Piedmont"). The Operating Agreement did not list her, or anyone else, as a director. Jack L. Freeman, Jr. ("Jack") indicated that Corinna was not a director of the company. Therefore, there is no evidence that Corinna breached her fiduciary duty as a director of Piedmont.

As the majority concludes, plaintiffs presented some evidence from which a reasonable inference could have been drawn that Corinna was an officer of the company. In the Operating Agreement, Corinna was designated as a chairperson of Piedmont. The Operating Agreement indicated that a chairperson was an officer of Piedmont. According to the Operating Agreement, she had the authority and responsibility to organize, conduct, serve as Chair and run meetings of the shareholders or officers. No other duties were listed for Corinna in the Operating Agreement.

However, Michael's testimony showed that Corinna did not perform any duties as chairperson.

[Corinna's counsel]: All right, and there's two people listed as chairpersons, correct?

[Michael]: Yes.

[Corinna's counsel]: And Corinna Freeman is listed there, correct?

[Michael]: Correct.

[Corinna's counsel]: Along with Jack Freeman.

[Michael]: Right.

[Corinna's counsel]: There was never a meeting where my client ran it on behalf of the companies, was there?

[Michael]: Not that I attended. Not that I remember.

[Corinna's counsel]: Well, you never received notice of one.

[Michael]: Pardon?

[Corinna's counsel]: You never received notice of a meeting that she called on behalf of the officers or shareholders that allegedly existed, correct?

[Michael]: Yeah, I don't remember anything like that.

[Corinna's counsel]: She never did anything pursuant to being the chairperson, correct?

[Michael]: No. She did other things, but not what's in there.

[Corinna's counsel]: Well, this gives her position. She's not listed as having any other position in the company, is she?

[Michael]: No.

Neither stockholders nor directors meetings were ever held nor was stock ever issued. Plaintiffs produced no evidence that Corinna was aware of her role as chairperson of Piedmont. Therefore, plaintiffs failed to show an existence of a fiduciary relationship based on Corinna's role as a "chairperson" of Piedmont.

Plaintiffs and the majority rely on Corinna's signature on several documents as "chairperson" and her signature on the January 2005 Wachovia deposit account application as "CEO" to maintain that she had a fiduciary duty to plaintiffs. Plaintiffs produced no evidence that Corinna ever signed any documents as chairperson or "CEO" after plaintiffs' involvement in November 2005. In addition, the Operating Agreement, signed by plaintiffs, listed Jack as the CEO, therefore, even if Corinna acted as CEO prior to November 2005, after plaintiffs invested and the Operating Agreement was executed her sole role in the company was a designation by the Operating Agreement that she was a chairperson.

The majority also concludes that Corinna had a fiduciary duty to plaintiffs as the majority shareholder. It is well established in North Carolina "that a controlling shareholder owes a fiduciary duty to minority shareholders." *Farndale Co. v. Gibellini*, 176 N.C. App. 60, 67, 628 ·S.E.2d 15, 19 (2006) (citations omitted). "To constitute the defendant a stockholder, it was necessary to show, not only that the stock had been issued, but that it had been actually or constructively accepted by the defendant." *Corp. Comm'n v. Harris*, 197 N.C. 202, 203, 148 S.E. 174, 175 (1929). However, the simple fact that the share certificates were never given to the defendant does not conclude that the defendant was not a shareholder. *See Marzec v. Nye*, 203 N.C. App. 88, 92-3, 690 S.E.2d 537, 541 (2010).

In January 2006, Jack increased Corinna's shareholder interest from 33 units to 88 units, making it appear that she was the majority stockholder in Piedmont. However, there is no evidence she knew of the original issuance of stock or of the increase. No stock certificates were ever issued and Corinna never signed any documents, either the original Operating Agreement or the Amendment that designated her as a shareholder. Since Corinna never knew she was a stockholder, plaintiffs failed to prove that she actually or constructively accepted the stock. Therefore, Corinna did not owe a fiduciary duty to plaintiffs as a majority shareholder.

B.  Breach of Fiduciary Duty

Even assuming, *arguendo*, that a fiduciary duty existed, plaintiffs failed to prove that Corinna breached that duty. Plaintiffs suggest the breach of duty is evidenced because Corinna (1) took funds for her own benefit and (2) failed to stop the corporate waste by Jack and Lawrence J. D'Amelio, III ("D'Amelio").

Plaintiffs claim Corinna took funds for her own benefit based on several bills that were paid, allegedly on her behalf. These included mortgage payments, Direct TV bills, Northstate Communication bills and utility bills from a house Corinna co-owned located on Burrows Road in Jamestown, North Carolina ("Burrows Road house"). Initially, there were two bank accounts for PEA, an account at First Citizen's Bank ("PEA account") and a Wachovia account ("Wachovia account") that had been set up by Jack's parents. Jack L. Freeman, Sr. deposited $20,000 in the Wachovia account for Jack and Jack used the account as his own personal checking account. When Jack drew a paycheck, he would deposit it into the Wachovia account. Plaintiffs' funds were deposited into two separate accounts with First Citizen's Bank, a money market account and a business checking account. Both accounts were in PCH's name. The bills from the Burrows Road house were not paid from the PCH accounts at First Citizen's where plaintiffs' money was deposited. Furthermore, while Corinna lived in the Burrows Road house at that time and co-owned the house, Jack testified that she had no knowledge of his actions and that he was living there and using those services for his own benefit.

The majority concludes that the evidence supported a reasonable inference that Corinna "knew how her own personal financial obligations were being paid" because "she knew that she herself was not paying them, yet her house was not foreclosed and her utilities were not shut off for nonpayment." According to the evidence at trial,

Corinna co-owned the Burrows Road house but Jack lived in the house beginning in 1991 and paid the mortgage payments as rent. Corinna lived in Belmont, North Carolina until November 2004, when she moved back to the Greensboro area and moved in with Jack. Corinna stayed in the Burrows Road house until completion of a handicap accessible house, located on Stafford Oak Drive in Jamestown. The mortgage and utility bills that plaintiffs claim were paid for Corinna's benefit were payments related to the Burrows Road house where Jack lived and he paid those bills for his own benefit. Since Jack had been paying the mortgage and utilities for a significant period of time, he continued those payments for the Burrows Road house even after Corinna moved in with him. Plaintiffs produced no evidence that Corinna knew Jack was using corporate funds to pay those bills. The majority seems to believe that because the bills were paid, Corinna must have known that Jack used corporate funds to pay those bills. However, plaintiffs produced no evidence of this at trial.

In addition, plaintiffs and the majority claim that Corinna breached her fiduciary duty by failing to stop corporate waste. Yet, there is no evidence that Corinna knew of the waste. Plaintiffs' witness, Michael, confirmed that Corinna only worked at the office a few times and her work was limited to training employees in the back office. Michael testified that on the few occasions when Corinna came into the office he might have said "Hello" to her, but never discussed any of the company problems with her. David Noble ("Noble"), an attorney at Piedmont between February 2006 and June 2006, indicated that he did everything at Jack's direction, as did the other company employees. In addition, Noble never observed Corinna working in the offices, there was no indication that she controlled Piedmont, and more importantly, that any actions taken by the company required her authorization. There was no evidence that Corinna actively participated in the management of the office, the assets, or business decisions or had any knowledge about operating Piedmont.

Furthermore, the case law cited by plaintiffs regarding fiduciary duties states the director's duty is to "administer" the corporation's property "for the mutual benefit of all parties interested; and, when such directors receive an advantage to themselves not common to all, they are guilty of a plain breach of trust." *Meiselman v. Meiselman,* 58 N.C. App. 758, 774, 295 S.E.2d 249, 259 (1982) *affirmed in part and modified in part by,* 309 N.C. 279, 307 S.E.2d 551 (1983) (citation omitted). Initially, we note that *Meiselman* was a case about usurpa-

tion of corporate opportunities, which is not at issue in the instant case. *Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d 551, 567 (1983).

In addition, there is no evidence that Corinna "administered" plaintiffs' funds for her benefit. Plaintiffs' funds were deposited into two separate accounts with First Citizen's Bank in PCH's name. D'Amelio transferred funds from PCH's business checking account into the PEA account. Crystal Byrd, the assistant treasurer, transferred funds from the money market account to the PEA account. There is no evidence that Corinna had access to either PCH account.

While Corinna did have access to the PEA account, the only evidence presented that she removed funds from that account is checks written as "signatory for C. Freeman." These checks were used to pay a Wachovia credit card bill in Corinna's name. Jack testified that Corinna helped him to get the credit card and allowed him to use her name because he had gone through a bad divorce and he had to file for bankruptcy. Jack indicated that even though the credit card was listed in Corinna's name, she never used the credit card and that all the charges on that card were his expenses. The evidence at trial was clear that Jack used the corporate accounts for his benefit, not Corinna's. When questioned about Corinna's use of the card, Michael stated that he was "not sure that [they could] prove that or not. You'll have to ask my lawyer...I don't know exactly what my attorney's plan is to do with that information." Michael also indicated that while he believed people would present information about Corinna's use of the card, he did not "know any particular exact thing that was hers." Despite Michael's claims that his attorney would admit evidence showing Corinna used the credit card, his attorney admitted that there was "no evidence before the [c]ourt right now that [Corinna] used the card...." Plaintiffs failed to show that Corinna breached her fiduciary duty by wrongfully administering plaintiffs' funds or corporate property. Therefore, I find that the trial court erred in denying Corinna's motions for directed verdict and JNOV on the issue of breach of fiduciary duty.

### III. Piercing the Corporate Veil

I agree with Corinna that plaintiffs failed to adduce evidence that she exercised dominion and control over Piedmont, and therefore she was not the party who caused plaintiffs' loss.

"[C]ourts will disregard the corporate form or 'pierce the corporate veil' and extend liability for corporate obligations beyond the

confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). North Carolina uses the "instrumentality rule" which states that "[a] corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of...affiliated corporations may be disregarded." *Id.* (citations omitted). The elements necessary to pierce the corporate veil under the instrumentality rule are:

> (1)  Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 454-55, 329 S.E.2d at 330. Factors considered in piercing the corporate veil are "[i]nadequate capitalization ... [n]on-compliance with corporate formalities, [c]omplete domination and control of the corporation so that it has no independent identity," and "[e]xcessive fragmentation of a single enterprise into separate corporations. *Id.* at 455, 329 S.E.2d at 330-31 (internal citations omitted).

Complete control and domination over a company is only the first requirement that must be met. In the instant case, plaintiffs contend Corinna exercised control over Piedmont in three ways: (1) she "repeatedly told the world that she was the dominant voice in the business," (2) she was the principal owner of Piedmont, and (3) she controlled the finances.

The majority contends that in the light most favorable to plaintiffs, the evidence supported piercing the corporate veil in regards to Corinna. However, the evidence indicated that Corinna was not involved with Piedmont at the time of plaintiffs' investment. Plaintiffs claim that Corinna was the dominant voice of the business yet plaintiffs' witness, Michael, indicated he never met her prior to his investment:

[Corinna's counsel]: In the 10 to 20 times that you met personally with Jack face-to-face, you never met my client, Corinna Freeman, did you?

[Michael]: No, I didn't

[Corinna's counsel]: You never talked to Corinna Freeman in any of the telephone calls that you had with Jack.

[Michael]: No, I didn't

[Corinna's counsel]: You never even asked to talk to Corinna Freeman in any of the meetings or telephone calls, did you?

[Michael]: No, I did not.

[Corinna's counsel]: Corinna Freeman provided no information to you when you were doing this investigation of this investment, did she?

[Michael]: No.

[Corinna's counsel]: You didn't ask her to produce any information for you, did you?

[Michael]: No.

[Corinna's counsel]: She didn't provide a single document to you, did she?

[Michael]: No; not directly.

[Corinna's counsel]: She never made any representation to you about this investment at all, did she?

[Michael]: No.

[Corinna's counsel]: She didn't make any representation to you as to how the companies would be organized, did she?

[Michael]: No.

[Corinna's counsel]: She didn't make any representation to you how they would be run, did she?

[Michael]: No.

[Corinna's counsel]: She didn't make any representation as to how your investment would be used, did she?

[Michael]: No.

[Corinna's counsel]: She never told you anything about these companies, did she?

[Michael]: No.

[Corinna's counsel]: You never asked, did you?

[Michael]: No.

...

[Corinna's counsel]: And in these meetings with Jack and [D'Amelio], [Corinna] was never present, was she?

[Michael]: No.

[Corinna's counsel]: And you didn't ask for her to be present, did you?

[Michael]: No.

Plaintiffs contend that Corinna's name on several documents prove that she was the dominant voice of the business. However, the plaintiffs' evidence only showed that Corinna's signature appeared on three occasions: 30 November 2001, 20 January 2005 and 20 May 2005. Although the documents listed Corinna as chairperson, CEO or owner, these documents were all signed by Corinna prior to plaintiffs' involvement. When plaintiffs became lenders for Piedmont, it was composed of PCH, PSAF and PEA. When Jack and D'Amelio created the new venture, they determined that PCH owned 100% of PSAF and PEA, as shown in the Flight Services Requirements Agreement. Therefore, although Corinna was the original owner of PSAF, once Piedmont was created, Jack and D'Amelio's own company, PCH, owned PSAF. The articles of incorporation creating PCH and PEA were not signed by Corinna. They were both signed by D'Amelio and indicated the incorporators were Jack and D'Amelio. Plaintiffs produced no evidence that Corinna ever represented to plaintiffs that she was an owner/chairperson/CEO. In fact, there was no evidence that Corinna had control over the documents signed after plaintiffs' investment. Specifically, the 22 November 2005 Loan Agreement and Promissory Notes (which plaintiffs characterized as a loan to Piedmont) in the amount of $400,000, the 22 November 2005 Operating Agreement, the two amended Exhibit Bs to the Operating Agreement, the 22 December 2005 agreement between NAT Group and PCH, and the Exhibit A amendment to the NAT Group agreement.

Furthermore, an individual's mere position as an officer does not prove the requisite amount of domination and control to subject an officer to individual liability when piercing the corporate veil. *See Atl. Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 165, 398 S.E.2d 641, 644 (1990) (where the defendant wife believed she was secretary of the companies and her duties included managing the restaurant and ordering goods, the Court found that the plaintiffs failed to show the requisite amount of control to pierce the corporate veil). In the instant case, Corinna's signature on documents, signed prior to plaintiffs' loan agreement, failed to show that Corinna had the requisite amount of control to dominate the newly created company, Piedmont.

Plaintiffs also claim that Corinna used her dominance and control to increase her ownership interest. Plaintiffs received and signed an Operating Agreement that listed the ownership percentage of each shareholder. The Operating Agreement indicated Corinna owned 33 units of the company. Corinna never signed the Operating Agreement nor did she ever receive stock certificates evidencing her ownership. Corinna testified in her deposition that she had no knowledge that she was considered a shareholder of Piedmont. Plaintiffs produced no evidence that Corinna was aware of her shareholder status or evidence that stock certificates were issued. In January 2006, two amendments to Exhibit B of the Operating Agreement listed Corinna's "CAPITAL CONTIBUTION" [sic] as owning 88 units of something. One listed Michael with 10 units and was signed by Michael. The other document listed Daniel with 4 units and was signed by Daniel. Jack testified that without her knowledge or permission, he signed his own name on both documents on the lines above Corinna's typed name. Jack did not sign "Corinna Freeman by Jack Freeman" but only "by Jack Freeman." In addition, although Jack signed both documents listing Corinna as owning 88 units, Corinna never received any stock certificate or any type of proof that she owned 88 units. Again, plaintiffs produced no evidence that Corinna was aware that she owned 88 units of Piedmont. In fact, the evidence at trial confirmed that although Jack and Michael knew of the transaction, Corinna was unaware. On cross-examination, at trial, Corinna's attorney questioned Michael about the fact that Jack signed the document for Corinna:

> [Corinna's counsel]: Okay. So you didn't get something signed by Corinna, did you?

[Michael]: No. When I brought this back to Jack and said, "Jack, this has never—we still haven't even signed this thing," he said, "I have—I can sign for her."

[Corinna's counsel]: All right. My question is you never – you still don't have something signed by her, do you?

[Michael]: Anything signed by her?

[Corinna's counsel]: This document is not signed by Corinna Freeman, is it?

[Michael]: Correct; no.

[Corinna's counsel]: You said you wanted something signed by Corinna Freeman, correct?

[Michael]: Correct.

[Corinna's counsel]: Jack Freeman is not Corinna Freeman, is he?

[Michael]: No.

[Corinna's counsel]: You didn't say, "Jack, I want it signed by your mother," did you?

[Michael]: No.

[Corinna's counsel]: You didn't call for a meeting of the shareholders at that time, did you?

[Michael]: No.

Plaintiffs failed to provide a scintilla of evidence that Corinna knew about the 33 units, knew that Jack increased that interest to 88 units, or approved or accepted in the increase. Jack testified that he never asked Corinna's permission to represent that she had any interest in the company or sought her approval to increase her interest. Jack and D'Amelio misrepresented that the company was a minority company by typing Corinna's name on the document because they wanted the company to be eligible for government contracts. Since plaintiffs failed to produce evidence that Corinna approved of an interest in the company, agreed to accept an increase, or was even aware of it, the purported transfer of 88 units of non-existing stock without her knowledge or permission does not prove that she exercised control over the company or that she used her control to increase her interest in Piedmont.

Finally, plaintiffs and the majority conclude that Corinna controlled the finances because her name appeared on some of the corporate accounts and because she benefitted from corporate funds. Although her name appeared on checks and credit cards, there is no indication that she dominated or controlled corporate funds by using these accounts. The checks "signed" by Corinna prior to June 2006 were signed "signatory for C. Freeman." Since Corinna's actual signature does not appear on the checks, the plaintiffs produced no evidence indicating that she signed or had knowledge that the checks were signed without her approval.

The checks Corinna actually wrote from Piedmont accounts were checks that were written in June 2006. There were three checks written to Piedmont employees and the memo section in the corner of the checks indicated that they were written as loans until NAT Group paid. These checks were written from the Wachovia account, not from the First Citizen's accounts where plaintiffs' funds were deposited. After the company relocated from D'Amelio's office to the new office and funds became scarce, Jack paid salaries and rent for the office from the Wachovia account. Corinna wrote all three checks at Jack's request.

Additionally, the plaintiffs produced no evidence that Corinna orchestrated payments for her bills or had knowledge that Jack used corporate funds to pay her bills. The mortgage and utility bills that plaintiffs claim were paid for Corinna's benefit were payments related to the Burrows Road house where Jack lived and those bills were paid for his own benefit. Plaintiffs produced no evidence that Corinna knew Jack was using a corporate account to pay those bills.

Corinna stated that she never saw the credit card statements or made payments towards those accounts. In fact, the bills for the two credit cards in Corinna's name, the American Express credit card and the Wachovia credit card, were sent to Piedmont's post office box. Plaintiffs failed to show that Jack's repeated payments for the mortgage and utilities, as well as the use of his mother's credit cards, were evidence that Corinna exercised dominance and control over Piedmont for purposes of piercing the corporate veil.

Plaintiffs mischaracterize Corinna's argument concerning the reason she claims no liability under the theory of piercing the corporate veil. Plaintiffs claim Corinna argues that Jack and D'Amelio's dominance over Piedmont precludes dominance by her. However, Corinna merely states that she simply did not exercise dominance or control

over Piedmont. Plaintiffs and the majority are correct that factors articulated in *Glenn* are present in the instant case. Piedmont was undercapitalized, Jack and D'Amelio failed to comply with corporate formalities and excessively fragmented a single enterprise into separate companies. Therefore, it was appropriate that the jury found in favor of plaintiffs on the issue of piercing the corporate veil against Jack and D'Amelio. However, despite plaintiffs' claim, Corinna did not dominate Piedmont because Corinna did not exercise control over the Piedmont companies. Corinna never dominated or controlled Piedmont. In fact, Michael testified repeatedly that Jack was in control of the company, "it was [Jack's] way. It was just his company." Michael also indicated that Jack exercised control over financial decisions and was "in charge of everyone." Michael did not even claim that Corinna had control, instead indicating again that Jack was in control and that he believed that Corinna signed over control to Jack, but that she did not control Jack.

Piercing the corporate veil as to Corinna would also require that the control and breach of duty must proximately cause the unjust loss. However, since plaintiffs failed to prove Corinna exercised domination and control over Piedmont that would subject her to individual liability, plaintiffs failed to prove her liability for corporate obligations should extend beyond the confines of a corporate separate entity and Corinna's motions for directed verdict and JNOV on the issue of piercing the corporate veil should have been granted.

## IV.  Conclusion

I find that the trial court erred by denying Corinna's motions for directed verdict and JNOV on the issue of breach of fiduciary duty. The trial court also erred by denying Corinna's motions for directed verdict and JNOV on the issue of extending her liability for corporate obligations beyond the confines of a corporate separate entity by piercing the corporate veil.